IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ADAM KEUP,<br><br>Plaintiff,<br><br>vs.<br><br>SARPY COUNTY, SARPY COUNTY SHERIFF JEFF DAVIS, in his individual and official capacities, SARPY COUNTY SHERIFF'S DEPUTY NICHOLAS PALMER, in his individual capacity as an employee of Sarpy County, and DEPUTIES JANE OR JOHN DOES, 1-4, in their individual capacities as employees of Sarpy County,<br><br>Defendants. | NO. 8:21-CV-312<br><br><br>MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |

Defendants Sarpy County, Sheriff Jeff Davis, and Deputy Nicholas Palmer (collectively, Defendants) have moved for summary judgment on claims brought by plaintiff Adam Keup. Keup sued Defendants for injuries sustained when a pepper ball[1] fired by Deputy Palmer struck Keup's eye while Keup attended a protest on May 29, 2020, in Omaha, Nebraska. Keup brings claims against Defendants under 42 U.S.C. § 1983 for retaliation in violation of the First Amendment and for a violation of his First Amendment rights. Before the Court are three of Defendants' Motions

---

[1] The parties use several spelling and capitalization variants of the term "pepper ball." *See, e.g.*, Filing 86 at 2 (¶ 9) ("PepperBall"); Filing 106 at 104 (¶ 8) ("Pepper balls"); Filing 106 at 110 ("pepper ball"). The Court will use the term "pepper ball" unless quoting.

for Summary Judgment on Keup's claims and several other Motions. For the reasons stated here, the Court grants Defendants' Motions for Summary Judgment and denies the other Motions.

## I. INTRODUCTION

### A. Factual Background

Keup and Defendants have submitted Statements of Facts. Filing 78; Filing 81; Filing 86; Filing 106. The facts are drawn from these statements. Unless otherwise indicated, the facts set out here are undisputed. The identification of the parties and the general timeline of events are largely undisputed in this case. All relevant events occurred on May 29, 2020, during a protest in Omaha, Nebraska. The Court will only discuss material facts "that might affect the outcome of the suit under the governing law." *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022) (internal quotations and citations omitted).

### 1. *The Evening of May 29, 2020*

#### a. The Police Response on May 29, 2020

On May 29, 2020, a protest broke out in Omaha, Nebraska, after the death of George Floyd, during which protesters repeatedly threw objects at police officers, attempted to set fires, and broke store windows. Filing 81 at 2 (¶ 1–2). The Sarpy County SWAT Team was one of the law enforcement agencies that assisted the Omaha Police Department with crowd control during the protest. Filing 81 at 3 (¶ 4). Deputy Palmer, along with his partner Deputy Strickler, were present as members of the Sarpy County SWAT team. Filing 81 at 3 (¶ 7). The deputies were clad in "full riot gear." Filing 86 at 9 (¶ 56).

Deputies Palmer and Strickler were located near the intersection of 72nd and Cass Streets, in front of a Walgreens parking lot. Filing 81 at 3 (¶ 3). At some point, law enforcement officials

called for pepper ball support[2] to disperse protestors on the sidewalk of Cass Street. Filing 81 at 5 (¶ 19). Deputies Palmer and Strickler were part of a "skirmish line" made up of "several hundred law enforcement officers" to engage in "crowd control." Filing 86 at 6 (¶ 38). In a skirmish line, "[o]fficers at the front of the line wear vests, helmets, and shields to protect against objects people hurl at them[,] Baton teams, PepperBall teams, and arrest teams stay close behind," and "[t]he very rear of the police line is where commands are given, agitators are arrested, and first aid is given to police and other subjects who might become injured." Filing 86 at 7 (¶ 39); see also Filing 106 at 48–49 (¶¶ 38–39).[3] By the time the Deputies reached the Walgreens parking lot, "[l]aw enforcement [had] formed a broken skirmish line." Filing 86 at 9 (¶ 55). Keup disputes this "to the extent the 'broken' line constituted a skirmish line at all." Filing 106 at 54 (¶ 55).

The parties agree that at some point, "the protests had turned violent" and "the street had closed at 72nd and Dodge and there was no way for the general public to travel to the intersection of 72nd and Dodge." Filing 86 at 4 (¶ 25). This caused the "protest occurring at that intersection [to have] been declared an unlawful assembly by law enforcement" prior to the Sarpy SWAT Team arriving to the area. Filing 86 at 5 (¶ 35). The parties also agree that when the SWAT Team arrived, people in the vicinity were "screaming, yelling at law enforcement, throwing things and lighting

---

[2] Defendants undisputed description of the "PerpperBall System" is as follows:

> The PepperBall System is commonly used to distribute PAVA powder or inert impact munitions in a riot setting or during crowd management exercises. Within close range, subjects can be targeted individually, or at greater distances the powder can be distributed over an entire group by firing a volley of projectiles against a wall, street, tree, or other hard object above, near, or upwind of a group of targets for distances up to 100 feet. Note that the capsicum powder is heavier than air and it quickly falls to the ground due to gravitational forces. On a windless day, the expected spread of the power is an approximate 8-12 foot diameter.

Filing 86 at 7 (¶ 44). "PAVA powder" is described by Defendants as a "2.5 gram payload of synthetic capsicum." Filing 86 at 20 (¶ 104).

[3] Although not disputing that a skirmish line had formed, Keup avers that "despite observing the area, Adam Keup denied observing the formation of a skirmish line or that officers were assembled in one." Filing 106 at 49 (¶ 40).

3

things on fire." Filing 86 at 5 (¶ 28). Defendants do not contend that Keup was engaged in these activities. The parties do not dispute that when the Deputies arrived at the Walgreens parking lot, there was at least one helicopter monitoring the protest. Filing 86 at 15 (¶ 76); *but see* Filing 106 at 60 (¶ 76) (Keup disputing Defendants' contention that "there were multiple helicopters" and noting that he only "became aware of a single helicopter after he was shot").

b.  Plaintiff Keup's Actions on May 29, 2020

Adam Keup went to the protest to observe and assist his partner, Grady Brodigan, with photographing the protest. Filing 106 at 106 (¶ 23). Keup testified in his deposition that he "was not protesting." Filing 105-1 at 32 (Deposition of Adam Keup). Keup was wearing a black sweatshirt and a black backpack in which "he was carrying additional [camera] lenses and memory cards." Filing 106 at 57, 69 (¶¶ 65, 94). Keup and Brodigan walked west along Cass Street towards the intersection between 72nd and Cass Streets and the Walgreens parking lot. Filing 106 at 106 (¶ 24). Keup observed law enforcement personnel standing in the Walgreens parking lot, Filing 106 at 106 (¶ 26), but never saw any individual shot with a pepper ball. Filing 106 at 107 (¶ 33). Keup avers that if he had "seen an individual shot with PepperBalls, he would have left immediately." Filing 106 at 107 (¶ 34). Keup further avers that "if he had known of an order to disperse prior [sic] arriving or had been given one there, he would have not gone or left immediately." Filing 106 at 58 (¶ 67). Keup admits however that "[p]rior to arriving to an area east of 72nd and Cass Street, Plaintiff could see multiple law enforcement vehicles in the Walgreens parking lot and in the roadway on Cass Street." Filing 106 at 58 (¶ 68). Despite this, "Plaintiff denied having any knowledge of any of the events that had transpired in the area earlier in the evening, including the closure of 72nd and Dodge Streets, the use of chemical munitions in

the area, riotous behavior by agitators, throwing of projectiles by protestors, fires in the Target parking lot, and looting." Filing 86 at 10 (¶ 69).

In addition, the parties agree that shortly before Keup was struck, another nearby individual (Individual 1) was targeted and hit by at least two pepper balls deployed by Deputy Palmer, causing him to leave the area. Filing 86 at 17 (¶¶ 89–90). However, there is a dispute over whether Keup was aware that Individual 1 was targeted and struck by pepper balls before evacuating:

> 91. [Defendants' statement of fact] Even though the first individual left the area after he was impacted by PepperBalls and [Keup] was facing law enforcement at the time law enforcement was deploying the first two rounds of PepperBalls at the first individual, Plaintiff did not leave the area.
>
> RESPONSE [by plaintiff Keup]: Disputed to the extent Adam Keup was facing Deputy Palmer at the time he was shot in the face. Adam Keup did not see Deputy Palmer until after he was shot. Further disputed that Adam Keup had time between the shooting of Individual 1 and him being shot in the fact [sic] to leave, even if he were aware of the first shooting. Deputy Strickler stated that the next thing he observed after Individual [sic] being shot in the legs was Adam Keup falling to the ground. This creates a reasonable infernce [sic] little time elapsed and there was not time for Adam Keup to observe Individual 1 and then decide to depart. More so, there was certainly not time for Deputy Palmer to shoot Individual 1 and then assess whether Adam was dispersing in response before he shot him.

Filing 106 at 68 (¶ 91). Keup contends—and Defendants do not dispute—that Deputy Palmer was "approximately 95 feet away from individual 1 when [individual 1] was shot." Filing 106 at 69 (¶ 94).

  c.  Deputy Palmer's Deployment of the Pepper Ball(s) that Injured Plaintiff Keup

It is undisputed that while near the intersection of 72nd and Cass Streets, Deputy Palmer aimed and fired a pepper ball in Keup's direction that struck him. Filing 81 at 6 (¶¶ 22–26); Filing 106 at 107 (¶ 30). Defendants do not contend that Keup had committed any crime or was threatening the officers in any way. Filing 106 at 112 (¶¶ 54–55). Defendants also do not dispute

5

Keup's contention that Keup was located approximately 174 feet away from Deputy Palmer when Deputy Palmer fired. Filing 106 at 31 (¶ 21). The parties disagree, however, on where Deputy Palmer was aiming when he fired, on whose command or direction Deputy Palmer fired, and where the pepper ball struck Keup.

Defendants contend that Deputy Palmer "aimed a shot at the sidewalk at Keup's feet" with "[t]he objective . . . to have the pepper ball disintegrate upon hitting the sidewalk and create a cloud of pepper to encourage Keup to leave the area." Filing 81 at 6 (¶ 22). Indeed, Defendants assert that "Deputy Palmer denies aiming his pepper ball gun at Keup's head" and that Deputy Palmer "was aiming for the sidewalk at Keup's feet and believes that the pepper ball struck the sidewalk and fragmented with fragments hitting Keup in the shoulder and face." Filing 81 at 6 (¶ 27). In other words, "Deputy Palmer did not intentionally shoot Plaintiff in the eye with a PepperBall." Filing 86 at 19 (¶ 103). Defendants continue, "Deputy Palmer fired a single pepper ball shot at the sidewalk near Keup, who immediately dropped to the ground," and "[w]hen the deputies reached Keup, he was rubbing his eye in a manner that indicated that he had an irritant in his eye, and he appeared to have a cut above his eye." Filing 81 at 6 (¶ 23, 26). Moreover, Defendants aver that Deputy Palmer fired at Keup "based solely on his good faith belief that law enforcement officers had indicated the correct individuals [including Keup] as instigators," and that Deputy Palmer "had no knowledge of any activity that those individuals may have been engaged in prior to the time he was called over to the sidewalk to provide support with a pepper ball gun." Filing 81 at 7 (¶¶ 30–31).

Keup disputes Defendants' averment that Deputy Palmer aimed at the ground near Keup, contending instead that "Deputy Palmer shot Adam directly in his eye and his shoulder with PepperBalls." Filing 106 at 14 (¶ 22); cf. Filing 81 at 6 (¶ 25) (Defendants disagreeing that Keup

6

was directly hit because "[a] direct hit from a pepper ball will leave powder residue on clothes and skin," whereas "Deputy Palmer observed no powder from the pepper ball on Keup's face and only a light dusting on his shirt, not the distinctive mark that would have been left by a direct hit"). Keup also disputes that Deputy Palmer fired only one shot, Filing 106 at 71–72 (¶ 99), and that any officer told Deputy Palmer to fire upon Keup. Filing 106 at 109–110 (¶ 44). In addition, Keup notes Deputy Strickler's deposition testimony that "the safety of the PepperBall gun fell out while it was in use during the night" and that Deputy Strickler did not "recall the type of PepperBalls that were re-loaded into the hopper." Filing 106 at 108 (¶ 37–38).

Regarding Keup's injuries, his ophthalmologists, Drs. Matthew Appenzeller and David Ingvoldstad, reported that Keup's "eye injury was 'consistent with severe non-penetrating blunt force trauma of the right eye,' and that 'Adam Keup has sustained a severe, blunt-force non-penetrating injury of the right eye which has resulted in permanent vision loss.'" Filing 106 at 118 (¶ 83). Dr. Appenzeller further reported that Keup's "medical status is completely due to blunt force trauma to the eye," and that "[s]uch blunt force must be significant." Filing 106 at 119 (¶ 84). Finally, Dr. Appenzeller reported that Keup "suffered a 'choroidal rupture' and that '[t]here is no doubt . . . that this choroidal rupture leading to loss of vision is due to blunt trauma directly striking the globe itself, consistent with Adam's report of being struck directly in the eye with a pepperball.'" Filing 106 at 119 (¶ 86).

### d. The Deputies' Actions After Keup's Eye Injury

The parties agree that Deputies Palmer and Strickler approached Keup after Deputy Palmer fired the pepper balls, Filing 86 at 20 (¶ 106), and that Deputy Strickler rinsed out Keup's eye with a water bottle, Filing 86 at 21 (¶ 116). There is also no dispute that "Deputy Strickler stayed with Plaintiff until the rescue squad arrived" and that "Plaintiff was compliant with law enforcement

7

while they waited for the emergency squad to arrive." Filing 86 at 22 (¶¶ 121–122). However, the parties offer differing characterizations of the intervening events.

According to Defendants, Deputies Palmer and Strickler, having observed "signs that [Keup] might have been injured by dropping to the ground" and what "appeared to [be] a cut above his eye," Filing 81 at 6 (¶ 24, 26), "[t]he deputies escorted Keup to get checked out by a paramedic and provided water so that he could flush out his eye." Filing 81 at 7 (¶ 29). Defendants aver that "Plaintiff was willing to go with Deputies Palmer and Strickler for his injuries to be assessed." Filing 86 at 20 (¶ 110). Deputies Strickler and Palmer explained that they "assisted Plaintiff to walk behind the skirmish line where it was safe and where tactical medics trained in first aid were located to look at his injuries" because they "did not feel it was safe to assess Plaintiff's injury where he fell as there were still protesters law enforcement was dealing with at the north entrance of the Walgreens parking lot." Filing 86 at 20 (¶¶ 108–109). Defendants further averred that "Keup accompanied them voluntarily and without argument to receive first aid and an examination." Filing 81 at 7 (¶ 29).

Keup recounts these events differently. According to Keup, "[a]s soon as the Deputies approached Adam, they put hands on him and did not remove their hands as they took him to the parking lot." Filing 106 at 116 (¶ 72). Keup avers that "the force and placement of hands felt like 'control measures.'" Filing 106 at 116 (¶ 73). In addition, Keup "recalled the deputies that were surrounding him directing him to come with them to the parking lot while firmly maintaining a continuous hold on him," and Keup "did not believe he was free to go." Filing 106 at 116–117 (¶¶ 74–75). Only after he was taken to the parking lot did Keup learn he was not under arrest. Filing 106 at 117 (¶ 76).

8

2. *Sarpy County Procedures*

a. Training Procedures for Deputies Palmer and Strickler

The following information regarding the training of Sarpy County Sheriff's Deputies and members of the SWAT unit is undisputed unless otherwise indicated. Initial training for all deputies consists of two weeks of general training at the Sarpy County Jail, which included firearms qualifications, studying departmental policies, and tours of the facilities, plus another six weeks of field training inside the jail. Filing 86 at 23 (¶ 130). Then, basic law enforcement training at the Nebraska Law Enforcement Training Center in Grand Island lasts for 16 weeks, where Sheriffs learn "basic law enforcement techniques, traffic rules, Nebraska criminal law, case law for the United States, practical functions, driving, firearms, defensive tactics, practical scenarios and situations which may be encountered on the job." Filing 86 at 24 (¶ 131). This training "include[s] handgun usage, shotgun usage, and basic rifle patrol class." Filing 86 at 24 (¶ 132). After basic training, deputies, including Deputies Palmer and Strickler, undergo two weeks of orientation with the Sarpy County Sheriff's Office, which includes "report writing, defensive tactics, firearms qualifications, and less lethal weapons training," followed by twelve weeks of field training, which includes "work[ing] with training officers who shows [sic] them how to handle calls, traffic stops, and complete report writing." Filing 86 at 24 (¶¶ 137–140). Deputies must also complete biweekly examinations during field training. Filing 86 at 24–25 (¶ 141).

In addition to the above training that all deputies receive, deputies seeking to join the SWAT Team must "go through an application process including two days of evaluation and testing, firearms proficiency testing, tactics, physical fitness testing, and a written examination covering tactical situations [and] are also subject to an oral board review." Filing 86 at 25 (¶ 149). The SWAT Team application also requires "a special shooting qualification test that has a higher

9

passing score than state qualifying tests." Filing 86 at 26 (¶ 151). During SWAT training, deputies are "trained to deploy PepperBalls by identifying specific targeting areas and learning to skip PepperBalls in front of a crowd in order to determine whether they will gain compliance without actually making an impact on a subject." Filing 86 at 26 (¶ 156). In addition, "[m]embers of the Sarpy County SWAT Team have ongoing training for the SWAT Team where they train every month, twice per month" and are "trained once per year in ongoing education on the use of the PepperBall deployment system during the bimonthly Sarpy County SWAT Team training." Filing 86 at 27 (¶¶ 161–162).

Deputy Palmer joined the Sarpy County Sheriff's office in 2016 and completed the training discussed above. Filing 86 at 23 (¶ 128). During his first year of employment, Deputy Palmer was trained to deploy pepper balls and scored 94% on the pertinent examination. Filing 86 at 25 (¶ 144). Deputy Palmer has been a member of the Sarpy County SWAT unit since 2018, after attending "the Omaha Police Department's basic SWAT school in 2018 for 80 hours," where he "trained regarding the use of firearms, less lethal munitions, gas, flash bangs, policies and procedures on serving search warrants, dealing with barricaded persons, and conducting a vehicle assault if there is a barricaded person in a car." Filing 86 at 25–26 (¶¶ 148, 152–153). In addition, "Deputy Palmer was also trained with less lethal munitions use during his training with Sarpy County SWAT Team, including handheld chemical munitions, tear gas, flash bangs, pepper spray, taser, less lethal shotguns, beanbag launchers, a 37-milimeter and 40-milimeter chemical munition launcher, a grenade launcher, a PepperBall gun, and an FN303 munition." Filing 86 at 26–27 (¶ 159).

Deputy Strickler has been with the Sarpy County Sheriff's office for around a decade. Filing 86 at 24 (¶ 133). He similarly attended "the Nebraska Law Enforcement Training Center in Grand Island for 16 weeks at the commencement of his employment as a deputy sheriff for basic

training," where he "was trained in patrol tactics, crashes, report writing, evidence, defensive tactics, firearms, and emergency vehicle operations." Filing 86 at 24 (¶¶ 133–134). Deputy Strickler received a "state qualification for handgun and AR-15 firearm certification." Deputy Strickler has been a member of the Sarpy County SWAT Team since 2017. Filing 86 at 24 (¶ 135). During training, "Deputy Strickler trained on weapons platforms, warrant service, high-risk incidents[,] physical testing . . . crowd control, crowd dispersal, and use of chemical agents for crowd dispersal." Filing 86 at 26 (¶ 154).

> Defendants describe the training for deployment of pepper balls as follows:

> The annual PepperBall training included training as to how the PepperBall platform works, what rounds come out of it, what they do, how to shoot it, zones on a person to shoot the PepperBall gun, how far the PepperBall can go, and what to do after you have shot someone with a PepperBall. . . . PepperBall munition training for Sarpy County SWAT Team members includes aftercare training, including what actions to take if someone is feeling effects from PAVA powder such as fresh air, rinsing affected areas with water, and offering medical attention to affected parties.

Filing 86 at 27 (¶ 163).[4]

> b. Standard Operating Procedures Related to Pepper Ball Deployment

Defendants describe the "PepperBall System" as "a non-lethal product . . . designed . . . to give law enforcement officers a safe, effective, and simple to use method for gaining subject compliance" and note that "[t]he PepperBall System has many characteristics that are applicable to a variety of situations where non-lethal force is an option." Filing 86 at 25 (¶ 145). Keup included with his Brief in Opposition to summary judgment a copy of the Sarpy County Sheriff's Office's Standard Operating Procedures (SOP) G-6230, related to the "the pepper ball system."

---

[4] Keup does not dispute that these are the training procedures but disputes that "Sarpy County deputies were sufficiently or properly trained on the handling of PepperBall weaponry." Filing 106 at 94 (¶ 163).

Filing 105-17. The "purpose" of SOP G-6230 is "to establish the guidelines for issuing and

deploying the pepper ball system." Filing 105-17 at 1. The policy itself is as follows:

> The pepper ball system is a less-lethal intermediate weapon that may be used in a variety of law enforcement situations where there is need to safely control noncompliant individuals. Pepper ball systems utilize high pressure compressed air to deliver the chemical agent oleoresin capsicum (OC) from a distance. Deputies of the Sarpy County Sheriff's Office shall use the pepper ball system only in accordance with established use of force policies and procedures (see G-6100 Use of Force). Only those pepper ball systems approved by the Sheriff shall be utilized. Only pepper ball systems approved and maintained by the Sheriff's Office shall be used.

Filing 105-17 at 1. The procedure relevant here regards "Deployment" and states,

> **C. Deployment:** The pepper ball system shall be deployed in accordance with all Sheriff's Office training standards, policies and procedures. Pepper ball systems shall only be deployed when justified according to the use of force policy (see G-6100 Use of Force).
>
> **1.** When tactically feasible, verbal commands shall be given prior to, during and after the deployment of a pepper ball system.
>
> **2.** The pepper ball system may be used to de-escalate potentially dangerous situations where lesser force options would likely be ineffective and where deadly force may not be appropriate. These situations may include[:]
>
> **a)** Barricade/hostage incidents.
>
> **b)** Suicidal persons.
>
> **c)** Violent or actively aggressive subjects that may cause injury.
>
> **d)** Cell extractions.
>
> **e)** Crowd control/civil disturbance.
>
> **f)** Animal control.
>
> **3.** Permission to deploy the pepper ball system must be obtained from a supervisor. It is not necessary for the supervisor to be on scene to grant permission, but he or she shall respond as soon as possible.
>
> **4.** Prior to deploying the pepper ball system, the deputy shall:
>
> **a)** Consider the safety of innocent by-standers, other deputies, and the subject.

**b)** Assign a deadly force cover deputy.

**c)** Prepare an arrest plan, when possible, as the effects of the pepper ball system may only be temporary.

**d)** When tactically feasible, announce to other deputies on scene that pepper ball system projectiles are about to be deployed.

**e)** Give loud verbal commands to the subject to obey the deputy's directions.

**5.** The pepper ball system may be deployed from zero (0) to thirty (30) feet. The primary target areas are:

**a)** Front of the body, below the shoulders, excluding the groin.

**b)** Back of the body, below the shoulders, excluding the spine.

**6.** The pepper ball system may be deployed to disperse a crowd or saturate an area up to a distance of one hundred (100) feet.

Filing 105-17 at 2–3. Despite the restrictions imposed by SOP G-6320, Keup notes that at his deposition "Sheriff Davis stated that Deputies could directly target individuals for PepperBall deployment even beyond 30 feet . . . if necessary . . . [a]s a lesser use of lethal force." Filing 106 at 120 (¶ 89). In addition, Keup notes that Deputy Larsen, an employee of the Sarpy County Sheriff's Office, "testified that when Sarpy County Deputies operate a[sic] PepperBall guns, Sarpy County generally mixes live, *i.e.*, irritant filled PepperBalls, with inert rounds" for cost-benefit purposes. Filing 106 at 106 (¶¶ 21–22).

Also relevant in SOP G-6320 is the "post-deployment procedure" which states,

**D. Post Deployment:**

**1.** Any deputy deploying a pepper ball system (including accidental discharges) shall immediately notify his or her supervisor. The supervisor shall respond to the scene.

**2.** The supervisor shall notify the on-duty watch commander or ADC.

**3.** The on-scene supervisor shall photograph the subject and the pepper ball impact areas as well as any secondary injuries resulting from the use of the pepper ball system.

13

**4.** As with the application of an aerosol subject restraint, any person struck with pepper ball OC rounds shall be administered any necessary first aid, after being secured.

**a)** Decontamination shall take place as soon as possible by use of cool water, a wet cloth, or cool air.

**b)** Deputies shall advise the subject that medical attention is available if desired.

**c)** The subject shall be transported to a medical facility if:

**(1)** The subject requests medical attention.

**(2)** The subject was struck by a pepper ball round in the head, neck, spine, or groin.

**(3)** The subject sustains an injury from a fall after impact from a pepper ball round.

**(4)** The subject appears to be having difficulty breathing.

**5.** If the subject was struck by a pepper ball round in the head, neck, spine or groin area, or a secondary injury requires hospitalization, the on-scene supervisor shall request the on-call investigator respond.

**6.** This policy recognizes that during large crowd control/civil disturbances, it may not be possible to apprehend or treat all the subjects struck or affected by pepper ball rounds.

Filing 105-17 at 3–4.

The pepper ball system procedures set forth above also reference SOP G-6100 on "Use of Force," which states,

> Sarpy County Sheriff's employees shall use force only when absolutely necessary, when justified by law and when other reasonable methods of resolution are ineffective or would be clearly inappropriate. Employees shall only use the amount of force which is reasonable and necessary under the circumstance as they know them to be. Application of force shall be discontinued as soon as the circumstances justifying its use cease.

Filing 105-16 at 1. SOP G-6100 also contains the following "Disclaimer":

> This policy is for Sheriff's Office use only and does not apply in any criminal or civil proceeding. The Sheriff's Office policy should not be construed as a creation of a higher legal standard of safety or care in an evidentiary sense with respect to third party claims. Violations of this policy shall only form the basis of Sheriff's

14

Office administrative sanctions. Violations of laws will form the basis of civil and/or criminal sanctions in a judicial setting.

Filing 105-16 at 1. SOP G-6100 spells out the "Use of Force Continuum," which states,

**A. Use of Force Continuum:** The Sheriff's Office has adopted a resistance control continuum as a model for the use of force. The levels of control are based on levels of resistance. It is important to understand that employees do not need to escalate through the levels of control in a step by step progression; employees shall utilize that force deemed "objectively reasonable" to control the resistance based on the totality of the circumstances.

1. Levels of Resistance

**a)** Psychological Intimidation: Nonverbal clues indicating a subject's attitude including but not limited to: a blank stare, clenching of fists, tightening of jaw muscles, etc.

**b)** Verbal Noncompliance: Any verbal response indicating a subject's unwillingness to obey commands of detainment, arrest, or to stop unlawful or dangerous behavior.

**c)** Passive Resistance: Any type of resistance where the subject does not attempt to defeat the officer's attempt to touch or control the subject, but still will not voluntarily comply with verbal and physical attempts of control (e.g. dead weight, does not react to verbal commands, sit-in protest, etc.).

**d)** Defensive Resistance: Any action by a subject that attempts to prevent an employee from gaining control of the subject (e.g. pulling/pushing away, resistance to handcuffing, etc.) but does not include attacking the employee.

**e)** Active Aggression: Physical actions/assaults against the employee or another person with less than deadly force (e.g. advancing, challenging, punching, kicking, grabbing, wrestling, etc.).

**f)** Deadly Force Assault: Force used against an employee or another person that may result in serious bodily harm or death. This does not require the use of a weapon.

2. Levels of Control:

**a)** Officer Presence: Identification of an employee's authority, by his or her uniformed presence or the verbal identification of being a deputy.

**b)** Verbal Direction: Lawful orders issued by an employee.

15

**c)** Soft Empty Hand Control: Strength techniques, joint locks, and pressure points. Generally, these techniques are used to control Passive or Defensive Resistance.

**d)** Hard Empty Hand Control: Hand strikes, kicks and the Shoulder Pin Restraint. Generally used to control Active Aggression, but may be used to control Defensive Resistance when lower forms of control have failed or the employee believes they would not be effective.

**e)** Intermediate Weapons: Any weapon to control resistance or an assault that is not part of the human body and which is not intended to cause death or serious bodily injury including, but not limited to: Aerosol Subject Restraints, impact weapons (batons, flashlights, etc.), Tasers, **Pepperball Systems**, Electronic Subject Restraints, Less Lethal Shotgun, etc. Generally, intermediate weapons are justified to control Active Aggression or when lower forms of empty hand control have failed or the employee believes they would not be effective.

**f)** Deadly Force: Force which the employee uses with the purpose of causing or which he or she knows to create a substantial risk of causing death or serious bodily harm (N.R.S. 28-1406). This includes, but is not limited to: the use of firearms, ramming vehicles, strikes with an impact weapon to the head, etc.

Filing 105-16 at 1–3 (emphasis added).

Also contained within SOP G-6100 is the procedure for "Use of Force," which states,

**B. Use of Force:**

**1.** The use of force continuum is a guide to what type and degree of force to use and is founded on the principles that employees should:

**a)** Respond to the resistance with a level of control that is sufficient to overcome the resistance, but is reasonable and necessary under the conditions.

**b)** Select a type and degree of force in consideration of the factors and circumstances including, but not limited to:

**(1)** Employee/subject size and gender.

**(2)** Environmental conditions.

**(3)** Reaction time and distance.

**(4)** Subject's access to weapons.

**(5)** Knowledge of the subject (e.g. history of prior violence).

**(6)** Type of crime committed or attempted.

16

**(7)** Subject is under the influence of alcohol or drugs.

**(8)** Number of employees and subjects.

**c)** Escalate the level of force if the present level is ineffective, or if the subject escalates resistance.

**d)** De-escalate the level of force as the subject is brought under control.

Filing 105-16 at 3. Finally. SOP G-6100 provides the procedure for "Treatment After Use of Force," which states,

D. Treatment After Use of Force:

**1.** Secure the subject using authorized restraints (see G-6300 Authorized Restraints) and place him or her in an upright position.

**2.** Observe the subject to determine their state of consciousness and physical condition. Seek medical treatment if necessary. Incidents that may heighten the need for medical treatment are:

**a)** Blows to the abdomen.

**b)** Violent resistance.

**c)** Use of Aerosol Subject Restraint or **Pepperball system**.

**d)** Difficulty breathing.

**e)** Subject complaint of pain.

**f)** Suspect under influence of alcohol or drugs.

**g)** Use of Taser.

**h)** Use of Electronic Restraint Device.

**i)** Use of Less Lethal Shotgun

**3.** Once the subject is secured, assist in decontamination if he or she has had contact with Aerosol Subject Restraint or **Pepperball**.

**4.** If necessary, obtain medical treatment for the subject prior to transport to the jail. Should a subject be transported by rescue squad, a deputy shall accompany the subject. Upon discharge from a medical facility, all medical paperwork shall be provided to the jail staff.

17

**5.** If the subject is admitted to the hospital, the shift supervisor shall notify the on-duty watch commander or the ADC.

**6.** The on-duty watch commander or the ADC shall determine if the subject may be issued a citation and released or needs a 24-hour guard.

**7.** If a 24-hour guard is required, the shift supervisor shall ensure a deputy is posted in the subject's room.

Filing 105-16 at 4 (emphasis added).

*3.  The Structure of the Sarpy County Sheriff's Office*

While Keup does not dispute that the above "Sarpy County SOPs are appropriate and consistent with the highest standards of conduct by American law enforcement officers," Keup disputes "that Sheriff Davis expected his deputies to abide by written Sarpy County SOP." Filing 106 at 97 (¶ 170). The Court will detail Sheriff Davis's role within the Sarpy County Sheriff's Office. The following facts are undisputed unless otherwise indicated.

Jeff Davis became Sheriff of the Sarpy County Sheriff's Office—an elected position—in 2005. Filing 86 at 29–30 (¶ 183); Filing 78 at 2 (¶ 1). Sheriff Davis "oversees the entire Sarpy County Sheriff's Office" and "his days are primarily spent with handling administrative functions, including being responsible for the approximately $19.5 million Sheriff's Office budget, and handling personnel matters that arise regarding the approximately 245 sworn law enforcement and civilian employees within the Sheriff's Office." Filing 78 at 2–3 (¶ 6). Keup notes that Sheriff Davis testified to being "the top of the chain of command in his office." Filing 106 at 24 (¶ 9). However, Sheriff Davis did not personally train or oversee the day-to-day operations of the Sarpy County SWAT team. Filing 78 at 3 (¶ 9). Instead, the Sarpy County SWAT team was comprised of the Sarpy County Sheriff's Office along with other Sarpy County law enforcement agencies pursuant to an Interlocal Agreement. Filing 78 at 2 (¶ 2). In addition, "[a]n Administrative Board comprised of the Sarpy County Sheriff and Chiefs of Police or their designees from the member

18

agencies established the training requirements and operational policies for emergency responses that were conducted by the SWAT team." Filing 78 at 2 (¶ 4). In May 2020, Lieutenant Gregory Monico—not party to this suit—was serving as the Administrative Board-appointed commander of the Sarpy County SWAT Team. Filing 78 at 3 (¶ 8).

On the evening of May 29, 2020, Sheriff Davis was notified that the Sarpy County SWAT Team was mobilized to deal with the protest. Filing 78 at 3 (¶ 9). Sheriff Davis "was not involved in briefing the team before they traveled to Douglas County, nor did he give the SWAT commander any operational instructions prior to their deployment that evening. Filing 78 at 3 (¶ 9). Keup disputes the import of this, contending that "Sheriff Davis was [ ] in charge and in ultimate command of Sarpy County Sheriff's Deputies working on Sarpy County SWAT," including Deputy Palmer. Filing 106 at 24 (¶ 9). On that evening, however, Sheriff Davis "had no communication with any of the operational leaders of the Sarpy County SWAT team." Filing 78 at 3 (¶ 10). To the contrary, "members of the Sarpy County SWAT team who were present and on duty in Omaha that evening were under the operational command of an Omaha Police Department officer who served as the incident commander." Filing 78 at 3 (¶ 11). Despite this, Keup contends that Sarpy County Sheriff's Deputies were nonetheless "also under the command of their Sarpy County superior officers" and "obligated to follow Sarpy County Standard Operating Procedure." Filing 106 at 24 (¶ 11). In addition, Sheriff Davis did not order Deputy Palmer to deploy a pepper ball at Keup; rather, Sheriff Davis was only made aware of the Sarpy County SWAT Team's activities at some time after officers returned. Filing 78 at 4 (¶¶ 12–15).

**B. Procedural Background**

Keup filed his original Complaint on August 16, 2021 against Sarpy County, Sarpy County Sheriff Jeff Davis in his official and individual capacities, and four unnamed Sarpy County

deputies. Filing 1. The original Complaint contained four counts: retaliation in violation of the First Amendment; a violation of the Fourth Amendment; a violation of the Fourteenth Amendment's due process clause, and state law negligence. Filing 1 at 7–11. On January 21, 2021, the Court granted in part Defendants' Motion to Dismiss, disposing of Keup's due process and negligence claims. Filing 20. On August 18, 2022, Keup filed an Amended Complaint. Filing 44. In the Amended Complaint, Keup includes his First Amendment retaliation and Fourth Amendment claims and adds Deputy Nicholas Palmer as a Defendant in his individual capacity. Filing 44. On August 29, 2023, Defendants filed their Motions for Summary Judgment. Filing 77; Filing 80; Filing 84. On September 15, 2023, Keup filed a Motion to Exclude Opinion Testimony of Defendants' Retained Expert Roy R. Bedard. Filing 91. On November 21, 2023, defendants Sheriff Davis and Deputy Palmer in their individual capacities filed a Motion for Leave to Cite Supplemental Authority in Support of Defendants' Motion for Summary Judgment. Filing 112. On November 30, 2023, defendants Sarpy County and Sheriff Davis in his official capacity filed an identically titled motion referring the Court to the same authority. Filing 113. These six Motions are presently before the Court.

## II.  The Non-Dispositive Motions

Three Motions are pending before the Court in the case besides Defendants' three Motions for Summary Judgment: Plaintiff's Motion to Exclude Expert Testimony, Filing 91, Defendants' Motion for Leave to Cite Supplemental Authority, Filing 112, and another Defendants' Motion for Leave to Cite Supplemental Authority, Filing 113. The Court denies both of the Motions for Leave to Cite Supplemental Authority. Regarding Plaintiff's Motion to Exclude Expert Testimony, the Court determines that Defendants are entitled to summary judgment without considering the expert opinion of Roy R. Bedard.

As to plaintiff's Motion to Exclude Expert Testimony, Keup takes issue with "Mr. Bedard['s] speculat[ion] that because Deputy Palmer stated he was not aiming at Plaintiff, Adam may have been struck by a ricochet." Filing 92 at 2. Because the Court must view the evidence in the light most favorable to the non-moving party and afford that party all reasonable inferences supported by the evidence, *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc.*, 34 F.4th 649 (8th Cir. 2022); *Pearson v. Logan Univ.*, 937 F.3d 1119, 1124 (8th Cir. 2019), the Court assumes for summary judgment purposes that Deputy Palmer did indeed fire a pepper ball directly at Keup, contrary to Mr. Bedard's testimony. Because this Order disposes of all Keup's claims, this Motion to Exclude is denied as moot.

Regarding Defendants' Motions for Leave to Cite Supplemental Authority, the Court can take judicial notice of intervening Eighth Circuit precedent. *See* Fed. R. Evid. 201; *Salier v. Walmart, Inc.*, 76 F.4th 796, 799 n.4 (8th Cir. 2023) ("We take judicial notice of these authorities."). Because there is no need to grant leave, these motions are also denied.

In addition, Keup included as defendants in his Amended Complaint four unnamed Sarpy County deputies in their individual capacities. Filing 44. However, Keup nowhere references these unnamed individuals in his Brief in Opposition to summary judgment. Filing 107. Keup also failed to adduce facts "sufficient to permit identification of the unnamed defendants after reasonable discovery." *Roe v. Nebraska*, 861 F.3d 785, 789 (8th Cir. 2017). Thus, the Court dismisses any claims against unnamed defendants.

### III. LEGAL ANALYSIS OF MOTIONS FOR SUMMARY JUDGMENT

After explaining the standards for summary judgment and qualified immunity, the Court will evaluate the three Motions for Summary Judgment. The Court will begin with defendant Deputy Palmer's Motion, which seeks summary judgment on Keup's alleged First and Fourth

Amendment violation claims against Deputy Palmer on the basis of qualified immunity. The Court will then proceed to Keup's claims against Sheriff Davis in his individual capacity and finally to Keup's claims against Sarpy County. For the reasons discussed below, the Court grants all three Motions for Summary Judgment.

### A.  Applicable Standards

*1.  Summary Judgment Standards*

Under Rule 56 of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

The Eighth Circuit Court of Appeals has explained,

> "Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." [*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)] (quotations omitted). A fact is "material" if it may "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue is genuine if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) (quotations omitted).

*Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1047–48 (8th Cir. 2022). To put the "materiality" requirement slightly differently, "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Rusness*, 31 F.4th at 614 (quoting *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019), in turn quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

22

On a motion for summary judgment, "a district court should 'not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.'" *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Great Plains Real Est. Dev., L.L.C. v. Union Cent. Life Ins.*, 536 F.3d 939, 943-44 (8th Cir. 2008)). Instead, the court must view the evidence in the light most favorable to the non-moving party and afford that party all reasonable inferences supported by the evidence. *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc.*, 34 F.4th 649 (8th Cir. 2022); *Pearson v. Logan Univ.*, 937 F.3d 1119, 1124 (8th Cir. 2019).

The parties bear specific burdens on a motion for summary judgment. "The moving party bears the burden of showing the absence of a genuine dispute." *Glover v. Bostrom*, 31 F.4th 601, 603 (8th Cir.) (citing Fed. R. Civ. P. 56(a)), *reh'g denied*, No. 20-2884, 2022 WL 1564097 (8th Cir. May 18, 2022). Thus, "'[t]he movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Mensie v. City of Little Rock*, 917 F.3d 685, 688 (8th Cir. 2019) (quoting *Torgerson*, 643 F.3d at 1042).

The burden on the resisting party is as follows:

The party opposing summary judgment must "cit[e] particular materials in the record" or show that the "materials cited do not establish the ... absence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "A mere 'scintilla of evidence' is insufficient to defeat summary judgment, and if a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate." *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015), quoting *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010).

Similarly, if the movant has supported its motion for summary judgment, the party opposing summary judgment "may not simply rest on the hope of discrediting the movant's evidence at trial." *United States v. 3234 Washington Ave. N.*, 480 F.3d 841, 844 (8th Cir. 2007) ("*3234 Washington*"). Where the testimony of the

movant's witnesses is critical, if the testimony is "positive, internally consistent, unequivocal, and in full accord with the documentary exhibits," "then the opposing party cannot force a trial merely to cross-examine the witness or in the hope that something might turn up at the trial." *Id.* at 845 (quotations omitted); *Nationwide Prop. & Cas. Ins. Co. v. Faircloth*, 845 F.3d 378, 382 (8th Cir. 2016). But summary judgment is improper where specific facts "even partially" undermine the witness's credibility in a material way. *3234 Washington*, 480 F.3d at 845.

*Erickson*, 31 F.4th at 1048. Thus, "'[t]o show a genuine dispute of material fact, a party must provide more than conjecture and speculation. Rather the nonmovant has an affirmative burden to designate specific facts creating a triable controversy.'" *Rusness*, 31 F.4th at 614 (quoting *McConnell v. Anixter, Inc.*, 944 F.3d 985, 988 (8th Cir. 2019)).

### 2. *Qualified Immunity Standards*

"Section 1983 provides a civil cause of action against any person who, under color of state law, causes a deprivation of the rights, privileges, or immunities secured by the Constitution and laws of the United States." *Wagner v. Jones*, 664 F.3d 259, 268 (8th Cir. 2011) (citing 42 U.S.C. § 1983; *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009)). When a state actor is sued in her individual capacity, she can plead an affirmative defense of qualified immunity. *Id.* (citing *Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir.2009)). The Eighth Circuit has recently summarized the standards for establishing entitlement to qualified immunity, as follows:

Qualified immunity provides some protection against suits for civil damages against government officials. See *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To overcome qualified immunity, the [plaintiff] must show that the officers violated a constitutional right, and that the unlawfulness of their conduct was clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 243-44, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). While the plaintiffs need not identify "a case directly on point," controlling authority or a robust consensus of persuasive authority must put the constitutional question "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

24

*Dundon*, 85 F.4th at 1255. Thus, to establish qualified immunity, Courts engage in a two-step inquiry when a defendant asserts qualified immunity: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (quoting *Nord v. Walsh Cnty.*, 757 F.3d 734, 738 (8th Cir. 2014)). Both questions must be answered affirmatively to defeat a defense of qualified immunity. *Id.* "And, courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.'" *Nord*, 757 F.3d at 738–39 (quoting *Pearson*, 555 U.S. at 236). In other words, "[t]he doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Its protection applies "regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

A right is clearly established if it is "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in original) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[T]he longstanding principle" is that "'clearly established law' should not be defined 'at a high level of generality.'" *Morgan*, 920 F.3d at 523 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Mullenix*, 577 U.S. at 12 ("The dispositive question is 'whether the violative

nature of particular conduct is clearly established.'" (quoting *Ashcroft*, 563 U.S. at 742)). "There need not be a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Morgan*, 920 F.3d at 524 (quoting *Ashcroft*, 563 U.S. at 741). Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (internal quotation marks omitted)). The plaintiff has the burden of showing that the law is clearly established. *Id.*

## B. Deputy Palmer is Entitled to Summary Judgment

Keup alleges that Deputy Palmer violated Keup's rights under the First Amendment and the Fourth Amendment. Filing 44 at 8–0 (¶¶ 66–81). Deputy Palmer asserts he is entitled to qualified immunity on these claims. The Court will evaluate Keup's claims against Deputy Palmer and Deputy Palmer's claims of qualified immunity, beginning with Keup's First Amendment claim and then turning to his Fourth Amendment claim.

### 1. Deputy Palmer Is Entitled to Qualified Immunity on Keup's First Amendment Claims Because Keup's Conduct Was Not Clearly Established as Protected

The Court notes at the outset that Keup abandoned or waived several First Amendment arguments by not defending them in his Brief in Opposition. In the Amended Complaint, Keup alleges,

> 67.    Defendants' decision to shoot Mr. Keup with a pepper ball violated the First Amendment in at least five ways: (i) as unconstitutional retaliation for expressive conduct protected under the First Amendment; (ii) as a violation of the right to peaceably assemble; (iii) as an unconstitutional restriction to a traditional public forum; (iv) as unconstitutional content-based and viewpoint-based discrimination; and (v) as a violation of Mr. Keup's right to record matters of public interest.

Filing 44 at 8 (¶ 67). Despite Deputy Palmer's arguments against all five of these allegations in his brief supporting summary judgment, *see* Filing 83 at 16–25, Keup failed to defend allegations (ii)–(iv) in his Opposition. *See generally* Filing 107. Thus, the Court considers claims (ii)–(iv)

26

waived because Keup did not address any arguments related to them. *See Int'l Bhd. Of Elec. Workers v. Hope Elec. Corp.*, 380 F.3d 1084, 1096 (8th Cir.2004) ("We ordinarily do not address issues that a party raises for the first time on appeal and failed to raise in the district court. Accordingly, we address the arguments that Hope Electrical asserted both on appeal and before the district court in opposition to Local 545's motion for summary judgment or in support of Hope Electrical's own motions[.]") (citation omitted). Therefore, the Court must only address Keup's claims that Deputy Palmer is liable for "unconstitutional retaliation for expressive conduct protected under the First Amendment" and for "a violation of Mr. Keup's right to record matters of public interest." Filing 44 at 8 (¶ 67).

a.  The Parties' Arguments

Deputy Palmer contends that he is entitled to sovereign immunity on Keup's First Amendment claims. Filing 83 at 16–25. In his brief supporting summary judgment, Deputy Palmer noted Keup's testimony that Keup "was standing and just kind of generally observing, seeing [his] partner take photos." Filing 83 at 23 (quoting Filing 81–4 at 34). Deputy Palmer argues that "[t]his logically negates any claim that he was exercising his right to record matters of public interest." Filing 83 at 24. In other words, Deputy Palmer argues that Keup was not engaged in protected conduct. Deputy Palmer further contends that even "[a]ssuming, arguendo, that Plaintiff's conduct satisfies the [protected conduct requirement], . . . Plaintiff is unable to present any evidence that Deputy Palmer took an adverse action against him because of Plaintiff's actions or speech," *i.e.*, retaliated against Keup for engaging in conduct protected by the First Amendment. Filing 83 at 17.

Keup argues the opposite, that Deputy Palmer is not entitled to qualified immunity. Filing 107 at 29. In his brief opposing summary judgment, Keup avers that he "was engaging in expressive

27

conduct when he was observing and assisting in documenting a protest and police activity and otherwise peaceably assembling." Filing 107 at 25–26. Keup further avers that "a reasonable jury could find that Keup's exercise of his First Amendment rights was the but-for cause of Palmer's use of excessive force," and that this precludes summary judgment. Filing 107 at 27. Because the Court finds dispositive Deputy Palmer's argument that Keup "is not entitled to First Amendment protection," Filing 83 at 24, the Court necessarily does not consider whether Deputy Palmer retaliated against Keup for engaging in protected conduct.

### b.   Applicable Standards

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment protects "symbolic or expressive conduct as well as . . . actual speech." *Virginia v. Black*, 538 U.S. 343, 358 (2003). The Eighth Circuit has explained that, "[t]o prevail on a First Amendment retaliation claim, [plaintiffs] must show: (1) they engaged in protected activity; (2) [the defendant] caused an injury to [plaintiffs] that would chill a person of ordinary firmness from continuing the activity; (3) and a causal connection between the retaliatory animus and injury." *Quraishi*, 986 F.3d at 837 (citing *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (per curiam)). Qualified immunity applies against First Amendment claims unless "the facts shown by the plaintiff make out a violation of a constitutional or statutory right" and the claimed constitutional right was "clearly established at the time of the defendant's alleged misconduct." *Morgan*, 920 F.3d at 523.

The Eighth Circuit has recently detailed the contours of what is "clearly established" as "protected activity" under the First Amendment, concluding that journalists did not engage in protected activity when they "observe[d] and record[ed] police conduct during [a] St. Louis protest." *Molina*, 59 F.4th at 338. In *Molina*, the Eighth Circuit interpreted "the Supreme Court's

28

50-year-old decision in *Colten v. Kentucky*, 407 U.S. 104 (1972),” where “the Supreme Court announced that individuals ‘[have] no constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation.’” *Molina*, 59 F.4th at 338. The *Molina* court determined that “*Colten* suggests that observing police conduct is not expressive.” *Id.* at 339. Finding that there had been no intervening change in the *Colten* standard, the Eighth Circuit determined that “a clearly established First Amendment right to record them [did not] exist in 2015.” *Id.* at 338–40. The *Molina* court further noted in a footnote,

> It is not beyond the realm of possibility that a First Amendment right to observe police exists, but our Fourth Amendment cases like *Walker* and *Chestnut* do not clearly establish it. And it makes good sense why. It is one thing to conclude that officers cannot arrest someone passively standing by and watching as they do their job. After all, in the absence of interference, there is no crime in it. But it is another matter to say that watching is itself expressive. Expressive of what? Not even [plaintiffs] Molina and Vogel can provide a clear answer.

*Molina*, 59 F.4th at 340 n.2.[5] However, even though “the right to observe police” is not “clearly establish[ed],” *id.*, the Eighth Circuit has made clear that “[p]eacefully protesting and reporting are generally protected forms of First Amendment expression. And a person of ordinary firmness would be chilled from continuing to report or protest after being pepper sprayed.” *De Mian v. City of St. Louis, Missouri*, No. 22-3000, 2023 WL 7852662, at *2 (8th Cir. Nov. 16, 2023).

---

[5] In ruling on Defendants’ Motion to Dismiss, the Court observed, “Although *Chestnut* was a Fourth Amendment case, its pronouncement of a constitutionally protected right to observe and record police activity leads the Court to find Keup was engaged in a protected activity when he was hit with a pepper ball. A strong consensus has developed amongst the circuits that this conduct fits within the First Amendment’s protections.” Filing 20 at 9. However, the Eighth Circuit in *Molina* clarified that while it was clearly established that “officers cannot arrest someone passively standing by and watching as they do their job” under the Fourth Amendment, *Chestnut* did not clearly establish that “observ[ing] police” constituted protected conduct under the First Amendment. *Molina*, 59 F.4th at 340 n.2. Indeed, the above quoted footnote suggests that observing police may not constitute protected conduct at all.

c.  Application

As discussed above, "[p]eaceful[ ] protest and reporting" is clearly established as protected conduct under the First Amendment, but merely "observ[ing] police" is not. However, Keup does not allege that he was "peacefully protesting and reporting"; in fact, Keup testified just the opposite:

A. [Keup:] I wasn't protesting.

Q. You weren't protesting?

A. No, I was not protesting.

Q. What were you doing?

A. Observing.

Q. The entire time you were there?

A. Yes.

Q. Were you taking any pictures?

A. I was not myself.

Filing 105-1 at 32 (Deposition of Adam Keup). Keup also stated in his Statement of Facts, "at the moment he was shot, Adam Keup was standing idly." Filing 106 at 111 (¶ 52). Thus, contrary to Keup's assertion in his brief that he "was observing and assisting in documenting a protest and police activity and otherwise peaceably assembling," Filing 107 at 25–26, Keup himself testified that he was merely observing rather than protesting, documenting, or participating in any assembly. Although the Eighth Circuit has stated, "It is not beyond the realm of possibility that a First Amendment right to observe police exists," *Molina*, 59 F.4th at 340 n.2., Keup does not refer the Court to any Eighth Circuit or Supreme Court precedent that "clearly established" this right in May 2020.

30

Keup contends, "Numerous circuit courts have concluded that recording the actions of police officers performing their official duties is encompassed within an individual's freedom of speech." Filing 107 at 26 (citing *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017); *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (Keup cites *Smith* twice in the string citation)). Assuming *arguendo* that the right to record officers is clearly established in three other circuits, Keup's argument still fails for two reasons. First, Keup was not recording officers; rather, as discussed above, he was merely observing the protest. Second, while "in the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits and district courts," the Court does not believe that a precedent adopted in only three circuits sets out a standard "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *K.W.P. v. Kansas City Pub. Sch.*, 931 F.3d 813, 828 (8th Cir. 2019); *see also Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 866 (8th Cir. 2021) (not recognizing "a district court's preliminary injunction as clearly established law in [that] case" when the same court issued the preliminary injunction against the same defendant).

Thus, Deputy Palmer is entitled to qualified immunity on Keup's First Amendment retaliation claim. The Court does not need to determine "whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right." *Morgan*, 920 F.3d at 523. Rather, it is sufficient to hold that Keup's alleged conduct (observing police) was not "clearly established" as protected by the First Amendment "at the time of the defendant's alleged misconduct." *Id.* Accordingly, because Keup has failed to adduce sufficient evidence to "persuade a jury," *Schilf*, 687 F.3d at 948, that Deputy Palmer violated any of Keup's clearly established rights, summary judgment on Keup's First Amendment retaliation claim against Deputy Palmer is appropriate.

2.   *Deputy Palmer Is Entitled to Qualified Immunity on Keup's Fourth Amendment Claims Because He Did Not Violate Any of Keup's Clearly Established Rights*

The Court begins with an evaluation of Keup's Fourth Amendment claims. In the Amended Complaint, Keup alleged the following:

76.   Mr. Keup did not commit a crime and was not suspected of committing a crime.

77.   Mr. Keup did not pose a threat to Defendants, any of their officers or agents, or any other person.

78.   Mr. Keup was seized by Defendants depriving him of his freedom of movement by shooting him in the eye with a pepper ball, forcibly removing him behind a police line, and flushing his injured eye without his consent.

79.   Defendants acted under the color of state law when Defendants committed these acts and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

80.   Mr. Keup fears further retaliation in the future in violations of the Fourth Amendment if he continues to observe, record, or otherwise participate in constitutionally-protected activity.

81.   As a direct and proximate result of Defendants' unlawful actions, Mr. Keup endured pain, suffering, and permanent severe injuries.

Filing 44 at 9 (¶¶ 76–81). As he explains in his brief opposing summary judgment, Keup advances two Fourth Amendment violations. His first theory is that by firing pepper balls at Keup, Deputy Palmer intentionally applied force to stop Keup—which constituted a seizure—and that his manner of doing so—firing a pepper ball at Keup from well beyond the 30-foot radius authorized by Sarpy County SOP G-6320—was unreasonable. Filing 107 at 16–19. His second theory is that Deputy Palmer unreasonably seized him when he brought Keup to a staging area to receive medical attention after Keup sustained an injury. Filing 107 at 19. As with Keup's First Amendment retaliation claim, Keup cannot succeed here unless "the facts shown by the plaintiff make out a

violation of a constitutional or statutory right" and the claimed constitutional right was "clearly established at the time of the defendant's alleged misconduct." *Morgan*, 920 F.3d at 523.

a.   The Parties' Arguments

Deputy Palmer's primary contention is that his "action falls within the range of law enforcement action that is not considered seizure." Filing 83 at 12. He also argues, "Alternatively, if a seizure is deemed to have taken place, it must also be an unreasonable seizure for it to violate the Fourth Amendment. In this case, the alleged seizure would not have been objectively unreasonable." Filing 83 at 12. Keup responds, "Defendant Palmer applied excessive force when he shot a[t] Keup with a pepper ball while he was peacefully observing and documenting the Black Lives Matter protest. Palmer is not entitled to qualified immunity." Filing 107 at 15. Specifically, Keup argues that "Defendant Palmer unlawfully seized Keup when he shot him with a pepper ball" and that "Palmer's actions after shooting Keup further support the reasonable inference Adam was seized by Palmer's excessive force," namely, transporting him to receive medical care. Filing 107 at 16, 19. Because the Court holds that neither of Deputy Palmer's actions—firing a pepper ball at Keup and using force when transporting him to get medical attention—constitute "seizures" within the meaning of the Fourth Amendment, there is no need to consider the "reasonableness" of those actions.

b.   Applicable Standards

The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "A seizure happens when, in view of all the circumstances, 'a reasonable person would have believed that he was not free to leave.'" *Doe v. Aberdeen Sch. Dist.*, 42 F.4th 883, 890 (8th Cir. 2022) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). "A seizure

requires the use of force with intent to restrain." *Torres v. Madrid*, 592 U.S. 306, 317 (2021); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (holding that the Fourth Amendment did not apply where an officer "accidentally stopped the suspect by crashing into him"). "Nor will force intentionally applied for some other purpose" constitute a seizure. *Torres*, 592 at 317.

In *Dundon*, the Eighth Circuit considered whether "officers effected a seizure when they used force against [protestors] with an intent to disperse the crowd." *Dundon*, 85 F.4th at 1255. The *Dundon* court concluded that "the protestors have not shown that it was clearly established as of November 2016 that a use of force designed to disperse a crowd constituted a seizure." *Id.* The court acknowledged that there was Eighth Circuit precedent at the time stating that use of force (including pepper spray, lead-filled bean bags, mace) constituted a seizure but distinguished those cases as "inapposite because the officer used force to *apprehend* a suspect," rather than to *disperse* them. *Id.* at 1256 (emphasis added) (citing *Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022); *Baude v. Leyshock*, 23 F.4th 1065, 1070 (8th Cir. 2022); *Small v. McCrystal*, 708 F.3d 997, 1002 (8th Cir. 2013); *Montoya v. City of Flandreau*, 669 F.3d 867, 873 (8th Cir. 2012); *Johnson v. Carroll*, 658 F.3d 819, 823-24 (8th Cir. 2011); *Shannon v. Koehler*, 616 F.3d 855, 858 (8th Cir. 2010)). The *Dundon* court also distinguished *Torres*, 592 U.S. at 317, "which held that police seized a suspect for the instant that police bullets struck her, even though the suspect temporarily eluded arrest thereafter" because that case also "involved force used to *apprehend* a suspect." *Dundon*, 85 F.4th at 1255 (emphasis in original) (also noting that "*Torres* was decided after the encounter at issue here, so it does not constitute clearly established law for purposes of this case"). Keup has not identified any authority showing that, at some point between November 2016 (the dispersal in *Dundon*) and May 2020 (the dispersal in this case) there was a change in applicable

34

law that "clearly established" use of force intended to disperse constitutes a "seizure" within the meaning of the Fourth Amendment. Nor has Keup identified any intervening authority establishing that using force for some purpose other than to restrain constitutes a seizure.

### c. It Was Not Clearly Established that Use of Force to Disperse Constituted a Seizure

Regarding Keup's first Fourth Amendment theory—that use of the pepper ball constituted a seizure—the Court holds that Palmer is entitled to qualified immunity because it was not "clearly established" at the time of the alleged misconduct that "a use of force to disperse rather than to apprehend constituted a seizure." *Dundon*, 85 F.4th at 1256. The reasoning in *Dundon* applies equally to this case because there is no genuine dispute that Deputy Palmer was trying to disperse rather than arrest Keup. Keup contends that "Palmer's version of the facts do not make common sense and are inconsistent with merely trying to disperse someone," explaining,

> Viewing Palmer's actions through an objective lens, the Court is faced with the following facts: Palmer saw Keup standing peaceably, Palmer did not see Keup holding anything; Palmer was not in fear of Keup; Palmer and Strickler did not order Keup to disperse or otherwise warn him despite its feasibility; Palmer shot Keup with pepperballs—some of which were likely inert; Palmer grabbed Keup after shooting him; and Palmer dragged Keup behind the skirmish line after shooting him. These facts, viewed in the light most favorable to Keup, undoubtedly demonstrate he was seized.

Filing 107 at 19. The Court disagrees that "[t]hese facts, viewed in the light most favorable to Keup, undoubtedly demonstrate he was seized." Filing 107 at 19. To the contrary, the context in which Deputy Palmer fired a pepper ball at Keup further shows that, objectively, Deputy Palmer was trying to disperse rather than arrest Keup. *See Burlison v. Springfield Pub. Sch.*, 708 F.3d 1034, 1042 (8th Cir. 2013) (Loken, J., concurring) (stating that "context matters" in the Fourth Amendment analysis); *United States v. Wood*, 16 F.4th 529, 538 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 1697 (2022) ("Because context matters under the Fourth Amendment, one's status in the

eyes of the government matters."). The undisputed context surrounding Deputy Palmer's actions

is as follows:

1.      In the hours and days after the death of George Floyd in Minneapolis, MN, protests, both planned and spontaneous, broke out throughout several parts of the United States and abroad.

. . .

4.      At approximately 8:30 p.m. on May 29, 2020, the Sarpy County SWAT team received a page from AlertSense at the direction of Lieutenant Monico to report to the Papillion Police Department in order to be deployed to the protests at 72nd and Dodge Streets.

. . .

21.      At 76th and Dodge, the Sarpy County SWAT team was briefed as to their duties upon arrival to the intersection of 72nd and Dodge to assist the Omaha Police Department in crowd control as the protests had turned violent.

. . .

23.      The environment had turned violent and chaotic as law enforcement were enduring projectiles being thrown that included rocks and frozen water bottles and at least one individual in the crowd had been detained with a shotgun.

24.      Law enforcement was made aware throughout the evening that other officers were impacted by projectiles being thrown by rioters, citizens being injured in the riots, fights occurring amongst protestors, people trying to burn down dumpsters, and property damage to businesses in the area.

25.      At the time Sarpy County SWAT arrived to [sic] the area on May 29, 2020, the street had closed at 72nd and Dodge and there was no way for the general public to travel to the intersection of 72nd and Dodge.

26.      Deputy Strickler's understanding during the Sarpy County SWAT briefing was that the PepperBall gun was to be deployed when a crowd was to be dispersed or to locate agitators within a crowd.

. . .

28.      In the context of the May 2020 riots at 72nd and Dodge, agitators were people in the crowd throwing rocks or other objects, becoming aggressive, lighting fires and inciting violence in the crowd.

. . .

34.     As the Sarpy County SWAT Team deployed to 72nd and Dodge, they observed a lot of people on the northwest side of Dodge Street in the Target parking lot screaming, yelling at law enforcement, throwing things and lighting things on fire.

35.     Prior to the time the Sarpy County SWAT Team arrived to [sic] the intersection of 72nd and Dodge, the peaceful protest occurring at that intersection had been declared an unlawful assembly by law enforcement. Law enforcement is permitted to declare unlawful assembly, and to disperse crowds in the interest of public safety.

. . .

38.     At approximately 9:00 p.m. on May 29, 2020, several hundred law enforcement officers including Sarpy County SWAT officers, including Deputy Palmer and Deputy Strickler, formed a skirmish line at 72nd and Dodge Street to accomplish crowd control.

. . .

42.     Deputy Strickler described deploying PepperBalls earlier in the evening in the Target parking lot North of the intersection of 72nd and Dodge in order to disperse agitators in the crowd that were throwing items at law enforcement prior to the formation of the skirmish line.

43.     As the skirmish line dispersed the crowd from the Target parking lot, the Sarpy County SWAT Team and Omaha Police Department were shooting PepperBall rounds and less lethal rounds into the crowd at their feet, throwing distraction devices, and throwing chemical emissions.

. . .

45.     The skirmish line of police officers first pushed the crowd toward the north out of the Target parking lot toward 72nd Street and then started pushing the crowd toward the east into the Petco parking lot in order to disperse violent protestors.

. . .

47.     At the time the crowd was dispersed from the Petco parking lot the environment and the crowd continued to be chaotic. Items were thrown at officers, gas was continued to be deployed, cars were honking, and people were yelling.

. . .

52.     Once meeting up with additional law enforcement members, Deputies Strickler and Palmer assisted with clearing the Walgreens parking lot located at 72nd and Cass Streets.

37

53.     Upon Deputy Strickler and Palmer's arrival to the Walgreens parking lot, the conditions of the lot were chaotic and similar to the Petco lot in that cars were trying to exit and law enforcement was pushing traffic onto Cass Street with a bottleneck of vehicles trying to exit to the north. People were yelling obscenities, threw objects and raced at officers in their vehicles as officers were trying to clear the lot. Loud music was playing in cars on the scene and people were screaming.

. . .

55.     Law enforcement formed a broken skirmish line in the Walgreens parking lot at 72nd and Cass Streets in an effort to accomplish crowd control in the Walgreens parking lot.

Filing 86 at 1–9 (¶¶ 1, 4, 21, 23–26, 28, 34–35, 38, 42–43, 45, 47, 52–53, 55) (internal citations to the record omitted) [6].

All of this undisputed evidence indicates that the Sarpy County SWAT Team in general and Deputy Palmer in particular were trying to clear an area in Omaha by dispersing (not arresting) individuals within the area. This belies Keup's contention that "[w]hen Palmer shot Keup at least twice with PepperBalls, he seized Keup" within the clearly established definition of "seizure" at the time, which as discussed above included use of force to arrest but not to disperse. Deputy Palmer clearly intended to disperse Keup when he fired pepper balls at him. The notion that Deputy Palmer was trying to arrest rather than disperse Keup, who all parties agree "did not commit a crime," Filing 106 at 112 (¶ 55), is farfetched: right before encountering Keup, Deputy Palmer had been actively engaged in the dispersal of several crowds which undisputedly included "violent protestors," Filing 106 at 51 (¶ 45), without attempting to arrest any of them. Deputy Palmer also had no cause to arrest Keup, given that all parties agree that "Keup did not commit a crime." Indeed, Keup was never placed under arrest. Filing 106 at 117 (¶ 76). However, Deputy Palmer

---

[6] Keup disputes the allegation in Paragraph 55 only to "the extent the 'broken' line constituted a skirmish line at all." Filing 106 at 54 (¶ 55).

did have cause to disperse Keup, who was present near the protest at the "intersection of 72nd and Dodge," which undisputedly "was closed to the public by law enforcement," Filing 86 at 15 (¶ 75), and "had been declared an unlawful assembly by law enforcement." Filing 86 at 5 (¶ 35). Thus, the evidence forecloses the possibility that Deputy Palmer deployed pepper balls at Keup in order to apprehend him. Therefore, Keup has failed to adduce sufficient evidence to "persuade a jury," *Schilf*, 687 F.3d at 948, that Deputy Palmer used force to apprehend rather than disperse Keup. Accordingly, the Fourth Amendment rights claimed by Keup as they pertain to Deputy Palmer's use of pepper balls were not "clearly established at the time of the defendant's alleged misconduct." *Morgan*, 920 F.3d at 523.

d.  Deputy Keup's Use of Force to Transport Keup to Safety and Medical Officials Was Not a "Seizure"

The Court also rejects Keup's second Fourth Amendment argument that "Palmer's actions after shooting Keup," namely, transporting him to a staging area behind the skirmish line to receive medical attention, "further support the reasonable inference Adam was seized by Palmer's excessive force." Filing 107 at 19. Keup explains,

> After being shot, deputies immediately grabbed him and maintained a continuous grip. The force and hand placement felt like "control measures." Adam Keup stated he recalled the deputies that were surrounding him directing him to come with them. Adam reasonably believed he was not free to go. Palmer's version of the facts do not make common sense and are inconsistent with merely trying to disperse someone.

Filing 107 at 19 (internal citations omitted). Plaintiff does not dispute, "After Deputy Strickler and Deputy Palmer saw Keup fall to the ground, they approached Keup and advised that they wanted to get him checked out. . . . Deputy Strickler and Palmer assisted Plaintiff to walk behind the skirmish line where it was safe and where tactical medics trained in first aid were located to look at his injuries." Filing 86 at 20 (¶¶ 106, 108). Therefore, the Court must decide whether on these

facts, it was "clearly established" that Deputy Palmer's actions constituted a "seizure" within the meaning of the Fourth Amendment. The Court holds that it was not.

As discussed above, the parties agree that Keup had committed no crimes and was not arrested. Filing 106 at 112, 117 (¶¶ 55, 76). Rather, Deputies Palmer and Strickler transported Keup a short distance to the nearby parking lot to obtain medical care for the injury to his eye and to call an ambulance. Filing 106 at 117 (¶ 77). Even accepting as true Keup's contention that officers applied force to Keup, under these circumstances, Keup cannot "persuade a jury," *Schilf*, 687 F.3d at 948, that Deputy Palmer applied any force to Keup with the "intent to restrain" him. *Torres*, 592 U.S. at 317.[7] Rather, the force was clearly "applied for some other purpose," *id.*— namely, to "to walk [Keup] behind the skirmish line where it was safe and where tactical medics trained in first aid were located to look at his injuries," Filing 86 at 20 (¶ 108)—meaning there was no "seizure" within the meaning of the Fourth Amendment. Therefore, Deputy Palmer is entitled to qualified immunity because "the facts shown by the plaintiff [do not] make out a violation of a constitutional or statutory right" *Morgan*, 920 F.3d at 523.

### C.  Sheriff Davis Was Not Personally Involved in any Alleged Violation of Keup's Rights

*1.  The Parties' Arguments*

Sheriff Davis contends that he is entitled to summary judgment on Keup's constitutional claims against him in his individual capacity. Filing 79 at 5. Sheriff Davis argues that § 1983 liability "for an individual actor must be based on that actor's own direct personal participation in a constitutional violation," *Askew v. Millerd*, 191 F.3d 953 (8th Cir. 1999), and that he "had no

---

[7] Although *Torres* stated this standard after the events underlying this case occurred, Keup has not identified any authority that clearly establishes that use of force for purposes other than to restrain an individual constitutes a seizure. Therefore, not only has Keup failed to show facts that make out a constitutional violation, but he has also failed to show that clearly established law proscribed the alleged misconduct by Deputy Palmer.

personal involvement in the actions taken by the Sarpy County SWAT team during the May 29th riot in Omaha, including the actions relating to the Plaintiff." Filing 79 at 7–8. Sheriff Davis further argues that he "did not directly participate in any alleged unconstitutional action or inaction" and "was not individually involved in directing the training or operational policies of the Sarpy County SWAT team." Filing 79 at 8. In addition, he contends that "[t]here was no 'pattern of unconstitutional acts' by Sheriff Davis's subordinates, let alone any such pattern of acts known to him or to which he was deliberately indifferent." Filing 79 at 13. Sheriff Davis explains that the alleged "use of a pepper ball system do[es] not support a finding of any constitutional violations" and that the "allegations of unlawful seizure [from the deputies taking Keup to get medical attention] are unsubstantiated." Filing 79 at 15–16. Finally, Sheriff Davis contends that there can be no liability for Sheriff Davis on theories of *respondeat superior* or due to any "policy or custom." Filing 79 at 17.

Keup contends that a question of fact exists whether Sarpy County's policies direct unconstitutional action, and accordingly, that Sheriff Davis can be liable because he "was in ultimate command of Sarpy County Sheriff's Deputies working on Sarpy County SWAT." Filing 107 at 30. Keup contends that Sheriff Davis can be liable for "encourag[ing]" deputies "to shoot people with pepperballs from beyond 30 feet," in contradiction of SOP G-6320. Filing 107 at 30. Keup explains that "a policy of encouraging officers to shoot anyone—let alone non-fleeing, unresisting, and unthreatening individuals exercising their First Amendment rights—from distances of greater than 30 feet would violate federal law," which Keup argues is "obvious" and "clearly established." Filing 107 at 31–32. The essence of Keup's opposition is his assertion that "[q]uestions of fact exist as to whether Palmer was following an unconstitutional policy or command from Davis." Filing 107 at 36.

41

In his Reply Brief, Sheriff Davis contends that Keup "makes no effort to argue in his brief that Davis should be held responsible in his individual capacity, a tacit admission that summary judgment should be granted on the Davis individual capacity claim."[8] Filing 110 at 2. Thus, Sheriff Davis rests on the arguments made in his Brief in Support of the Motion for Summary Judgment. Filing 79.

  2.  *Applicable Standards*

The Eighth Circuit has stated, "Liability under section 1983 is 'personal.'" *Molina v. City of St. Louis, Missouri*, 59 F.4th 334, 344 (8th Cir. 2023) (citing *White v. Jackson*, 865 F.3d 1064, 1080–81 (8th Cir. 2017)). In other words, "a plaintiff must show each individual defendant's personal involvement in the alleged violation." *Id.* In addition,

> While the doctrine of *respondeat superior* does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his failure to properly supervise and train the offending employee caused the constitutional violation at issue. Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in creating, applying, or interpreting a policy that gives rise to unconstitutional conditions. In requiring a plaintiff to allege that each defendant was personally involved in the deprivation of his constitutional rights, we assess each defendant relative to his authority over the claimed constitutional violation.

*Elder v. Gillespie*, 54 F.4th 1055, 1065 (8th Cir. 2022) (quoting *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (cleaned up)). The plaintiff must assert "facts showing the [ ] defendants' direct involvement in the formation, implementation, or enforcement of the alleged policy." *Id.* at 1066. This requires demonstrating "that the supervising official, through his own individual actions, has

---

[8] Sheriff Davis is correct that Keup does not explicitly argue that Sheriff Davis should be held responsible in his individual capacity. However, Keup does not concede the point, and Keup's arguments reproduced above can be fairly understood to encompass the claims against Sheriff Davis in his individual capacity made by Keup in the Amended Complaint. Filing 44. Therefore, the Court does not consider that Keup's claim against Sheriff Davis in his individual capacity has been waived.

violated the Constitution." *L.L. Nelson Enterprises, Inc. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 810 (8th Cir. 2012).

Therefore, because Keup does not argue that Sheriff Davis personally trained officers or directed the use of pepper balls against Keup, Filing 106 at 23, 26 (¶¶ 9, 16), the Court must only determine whether there is a genuine issue of material fact as to Sheriff Davis's "involve[ment] in creating, applying, or interpreting a policy that gives rise to unconstitutional" violations. *Id.* The Court holds that there is no genuine issue of material fact on this matter and that Sheriff Davis is entitled to summary judgment.

### 3. Application

As discussed above, Keup argues that "the policy [Davis] has set for his officers, notwithstanding the written SOP, permits and encourages the shooting of citizens from beyond 30 feet." Filing 107 at 31. The record does not support this assertion. The only evidence that Keup offers in support of this contention is the following portion of Sheriff Davis's deposition testimony:

> Q. Based on your understanding of this policy, is it appropriate to target pepper balls for direct body impact beyond 30 feet?
>
> A. [Sheriff Davis] If necessary, yes. As a lesser use of lethal force, yes.
>
> Q. Can you show me in the policy where it says that?
>
> A. [Sheriff Davis] No, I can't. Maybe if you want a scenario, I will tell you versus using a different use of force, if -- when you're less than or more than 30 feet away, and you shoot the first pepper ball, and nothing happens, if you have to raise your level and shoot somebody in a lower section to make it work, we're going to want you to do that before you use a different use of force. So I don't know what you're asking me.

Filing 106 at 120 (¶ 89). Thus, there is no dispute Sheriff Davis testified that, in contradiction to SOP G-6230, it may be appropriate to shoot an individual from beyond 30 feet away. Keup contends that Sheriff "Davis's deposition testimony [creates] a question of fact for the jury." Filing

107 at 31. However, citing Sheriff Davis's opinion on a matter expressed during his deposition is not the same as demonstrating "that the supervising official, through his own individual actions, has violated the Constitution." *L.L. Nelson Enterprises, Inc.*, 673 F.3d at 810. The record is devoid of any facts suggesting that Sheriff Davis was in any way "involved in creating, applying, or interpreting [the] policy" at issue." *Elder*, 54 F.4th at 1065. To the contrary, it appears that Sheriff Davis has nothing to do with "the formation, implementation, or enforcement of" the pepper ball policy. *Id.* at 1066. Evidencing this, it was undisputedly not Sheriff Davis, but "[a]n Administrative Board comprised of the Sarpy County Sheriff and Chiefs of Police or their designees from the member agencies [that] established the training requirements and operational policies for emergency responses that were conducted by the SWAT team." Filing 106 at 22 (¶ 4). Therefore, Keup has not demonstrated "facts showing the [ ] defendants' direct involvement in the formation, implementation, or enforcement of the alleged policy." *Elder*, 54 F.4th at 1066. Because Keup has failed "to designate specific facts creating a triable controversy," Sheriff Davis is entitled to summary judgment. *Rusness*, 31 F.4th at 614.

### D.  Municipal Liability Against Sarpy County Is Inappropriate Here

#### 1.  *The Parties' Arguments*

Sarpy County argues[9] that it is entitled to summary judgment on Keup's claims against it. Filing 85 at 3. Sarpy County contends that Keup cannot "show that liability against Sarpy County attaches under [any] of the following three theories: 1) the violation resulted from an official municipal policy; 2) the violation resulted from an unofficial custom; or 3) the violation arises

---

[9] The claims against public officials "in [their] official capacit[ies], are "actually . . . against the entity for which the official is an agent." *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006). Thus, the Court considers the claims against Sheriff Davis in his official capacity together with the claims against Sarpy County.

from a deliberate [sic] indifferent failure to train or supervise an official or employee." Filing 85 at 3. Regarding the first theory (official policy), Sarpy County argues that "[t]he Sarpy County SOPs are appropriate and consistent with the highest standards of conduct by American law enforcement officers," and that Keup "has failed to cite any evidence that Sheriff Davis or any other policymaker on behalf of Sarpy County directed law enforcement to act in a manner that was inconsistent with established relevant Sarpy County Standard Operating Procedures." Filing 85 at 5.

Regarding the second theory (unofficial custom), Sarpy County asserts that "[t]he only allegation in Plaintiff's Complaint, that Sarpy County had an unconstitutional custom of using less-lethal force to control and suppress demonstrations, is not supported in the factual record and would not give rise to a valid claim under 42 U.S.C. §1983." Filing 85 at 7. Sarpy County also notes that "there are no known other use of force complaints against a Sarpy County Sheriff's Deputy arising from the use of a PepperBall munition or use of force complaints arising from the use of less lethal force during crowd control operations since the time Sheriff Jeff Davis was enacted as Sheriff in 2005." Filing 85 at 7. Accordingly, Sarpy County argues that Keup "has not shown any evidence that there was any widespread pattern of unconstitutional deployment of less lethal munitions by the Sarpy County Sheriff's Office." Filing 85 at 7.

Regarding the third theory (deliberately indifferent failure to train), Sarpy County contends that the Sarpy County SWAT Team in general and Deputy Palmer in particular were well-trained to handle the events that occurred during the protest. Filing 85 at 11–12. Sarpy County argues that "the members of the Sarpy County SWAT Team present at the May 29, 2020 riots had more training and preparation than standard members of law enforcement for the events experienced on

that evening" and that Deputy Palmer "was trained and experienced with the use of the PepperBall munition, less lethal munitions, and crowd control." Filing 85 at 12.

In response, Keup argues that "Sarpy County showed deliberate indifference to the constitutional rights of citizens, and its indifference was the moving force behind the violation of Keup's rights." Filing 107 at 29 (emphasis removed). Regarding the "official policy" theory, Keup contends that there is a question of fact as to whether Sarpy County's policy encourages law enforcement officers to shoot individuals with pepper balls from distances of greater than 30 feet, which Keup asserts is unconstitutional. Filing 107 at 30–31. Keup argues that Sheriff Davis "admitted that the policy he has set for his officers, notwithstanding the written SOP, permits and encourages the shooting of citizens from beyond 30 feet." Filing 107 at 31. Regarding the "deliberately indifferent failure to train" theory, Keup asserts, "Even if Davis's concept of when it is permissible to shoot people does not rise to the level of official policy, his testimony indicates that he and his office were not properly training officers to follow the SOP," meaning that "Sarpy County either actively trained officers to directly target individuals beyond 30 feet, or failed to train officers not to do so, despite the plain language of SCSOP G-6230." Filing 107 at 31–32.

   *2.  Applicable Standards*

The Eighth Circuit has stated, "Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016). Because Keup does not advance any arguments under a "custom" theory of municipal liability in its Brief in Response to the Motion for Summary Judgment, *see generally* Filing 107, the Court will only address the "policy" and "deliberately indifferent failure to train" theories of municipal liability.

46

Regarding the "policy" theory of municipal liability, the Eighth Circuit has stated, "A policy can be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Dahl v. Rice Cnty.*, 621 F.3d 740, 743 (8th Cir. 2010). "Where a municipal policy or custom "itself violates federal law, or directs an employee to do so, resolving [ ] issues of fault and causation is straightforward." *Doe v. Fort Zumwalt R-II Sch. Dist.*, 920 F.3d 1184, 1189 (8th Cir. 2019) (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). However, "the fact that 'a particular official—even a policymaking official— has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.'" *Bolderson*, 840 F.3d at 985–986 (citation omitted).

Regarding the "deliberately indifferent failure to train" theory of municipal liability, the Eighth Circuit has stated that an entity is only "liable under Section 1983 for constitutional violations resulting from its failure adequately to train its employees if the failure to train rises to the level of 'deliberate indifference' to the people's rights." *Larkin v. St. Louis Hous. Auth. Dev. Corp.*, 355 F.3d 1114, 1117 (8th Cir. 2004) (citations omitted). Where "'[a]n objectively reasonable officer would know that it is impermissible' to engage in [a particular] behavior . . . there is no patently obvious need to train an officer not to" engage in that behavior. *Marsh v. Phelps Cnty.*, 902 F.3d 745, 753 (8th Cir. 2018) (quoting *Parrish v. Ball*, 594 F.3d 993, 999 (8th Cir. 2010)). In addition, the Supreme Court has explained that plaintiffs usually must prove deliberately indifferent failure to train by showing multiple instances of constitutional violations:

> A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—

47

> necessary to trigger municipal liability. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citations and quotation marks omitted). However, the Eighth Circuit has noted, "The Supreme Court has not foreclosed the possibility that a single violation of constitutional rights could trigger municipal liability, where the violation is accompanied by a showing that the municipality had 'failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 393 (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)). For a single violation to trigger municipal liability under this theory, the "need for training or other safeguards" must be "so obvious at the time of this incident that the [defendant's] actions can properly be characterized as deliberate indifference to [the plaintiff's] constitutional rights." *Id.*

### 3.  Application

#### a.  Keup's "Official Policy" Argument Is Unavailing

Keup does not contend that the SOPs themselves "violate[ ] federal law, or direct[ ] an employee to do so." *Fort Zumwalt R-II Sch. Dist.*, 920 F.3d at 1189; see also Filing 106 at 97 (¶ 170) (not disputing that the "Sarpy County SOPs are appropriate and consistent with the highest standards of conduct by American law enforcement officers"). Instead, Keup contends that Sheriff "Davis essentially admitted that the policy he has set for his officers, notwithstanding the written SOP, permits and encourages the shooting of citizens from beyond 30 feet," Filing 107 at 31, and this is the unlawful policy.

48

In the above section regarding the claims against Sheriff Davis, the Court determined that Sheriff Davis's testimony about the permissibility of deploying pepper balls from beyond 30 feet, standing alone, did not create a genuine issue of material fact about whether Sheriff Davis was personally involved "in the formation, implementation, or enforcement of the alleged policy." *Elder*, 54 F.4th at 1066. Keup's claims against Sarpy County fails for essentially the same reason Keup's claims against Sheriff Davis in his individual capacity failed: Namely, the opinion expressed by Sheriff Davis about the pepper ball deployment policy is not probative of Sarpy County's "official policy" because the SWAT Team SOPs—over which Sheriff Davis has no input or control—undisputedly govern the "official policy." *See* Filing 106 at 22 (¶ 4) ("An Administrative Board comprised of the Sarpy County Sheriff and Chiefs of Police or their designees from the member agencies established the training requirements and operational policies for emergency responses that were conducted by the SWAT team."). Thus, Sheriff Davis did not make a "decision" from which a "policy can be inferred," *Dahl*, 621 F.3d at 740; rather, the evidence shows that Sheriff Davis merely expressed his view that was perhaps inconsistent with the policy formulated by others. In addition, even if Keup could show that Sheriff Davis somehow "has discretion in" determining how pepper balls are deployed—something Keup has not shown— this would "not, without more, give rise to municipal liability based on an exercise of that discretion.'" *Bolderson*, 840 F.3d at 985–986 (citation omitted).

Because there is no other evidence in the record suggesting that there is a "policy" of permitting or encouraging the deployment of pepper balls from beyond 30 feet, Keup's claims against Sarpy County necessarily depend heavily on Sheriff Davis's testimony, which as explained is not probative. Filing 106 at 120 (¶ 89). Instead, the official policy is set by the Sarpy County SOPs, which Keup concedes "are appropriate and consistent with the highest standards of conduct

by American law enforcement officers." Filing 106 at 97 (¶ 170). Therefore, there is no "genuine issue" as to whether Sarpy County's "policy" authorizes use of pepper balls from beyond 30 feet because "the evidence is [not] sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." *Schilf*, 687 F.3d at 948 (quotations omitted).

> b. Keup's "Deliberately Indifferent Failure to Train" Argument Is Unavailing

The essence of Keup's argument here is that the single incident of Deputy Palmer firing a pepper ball at Keup from beyond 30 feet evinces a deliberately indifferent failure to train officers to properly deploy pepper balls. *See* Filing 107 at 31–33. He argues that Sheriff Davis or Sarpy County "was so indifferent to the risks that he [or it] did not train [ ] officers to comply with the written SOP." Filing 107 at 34. The Court disagrees. Because Keup only alleges that a "single violation of constitutional rights" is sufficient to "trigger municipal liability" in this case, Keup must show "that the municipality had 'failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Szabla*, 486 F.3d at 393 (citation omitted). The Court does not need to decide whether "recurring situations" requiring pepper ball deployment "present[ ] an obvious potential for [a constitutional] violation" because the record clearly shows that Sarpy County "train[ed] its employees to handle" such situations. *Id.*

The record is replete with evidence that members of the Sarpy County SWAT Team, and Deputy Palmer in particular, were well-trained in pepper ball deployment in May 2020. As discussed above, all Sarpy County deputies receive two weeks of general training and six weeks of field training inside the jail, then sixteen weeks of "basic law enforcement training" at the Nebraska Law Enforcement Training Center. Filing 86 at 23–24 (¶¶ 130–131). This is followed

50

by another two weeks of orientation and twelve more weeks of field training outside the jail, during which period deputies are subject to biweekly examinations. Filing 86 at 24–25 (¶¶ 137–141).

The requirements for joining the Sarpy County SWAT Team are even more stringent. To join, deputies must "go through an application process including two days of evaluation and testing, firearms proficiency testing, tactics, physical fitness testing, [ ] a written examination covering tactical situations[,] . . . an oral board review," and "a special shooting qualification test that has a higher passing score than state qualifying tests." Filing 86 at 25–26 (¶ 149–151). Deputies on the Sarpy County SWAT Team also receive additional training, including pepper ball training. Filing 86 at 26 (¶ 156) (deputies are "trained to deploy PepperBalls by identifying specific targeting areas and learning to skip PepperBalls in front of a crowd in order to determine whether they will gain compliance without actually making an impact on a subject"); Filing 86 at 27 (¶¶ 161–162) ("Members of the Sarpy County SWAT Team have ongoing training for the SWAT Team where they train every month, twice per month" and are "trained once per year in ongoing education on the use of the PepperBall deployment system during the bimonthly Sarpy County SWAT Team training"). The specific pepper ball deployment training that Sarpy County SWAT Team members receive is as follows:

> The annual PepperBall training included training as to how the PepperBall platform works, what rounds come out of it, what they do, how to shoot it, zones on a person to shoot the PepperBall gun, how far the PepperBall can go, and what to do after you have shot someone with a PepperBall. . . . PepperBall munition training for Sarpy County SWAT Team members includes aftercare training, including what actions to take if someone is feeling effects from PAVA powder such as fresh air, rinsing affected areas with water, and offering medical attention to affected parties.

Filing 86 at 27 (¶ 163). Deputy Palmer not only received all the above training, he also attended "the Omaha Police Department's basic SWAT school in 2018 for 80 hours," where he "trained regarding the use of firearms, less lethal munitions, gas, flash bangs, policies and procedures on

serving search warrants, dealing with barricaded persons, and conducting a vehicle assault if there is a barricaded person in a car." Filing 86 at 25–26 (¶¶ 148, 152–153). In addition, Deputy Palmer proved to be more than proficient in passing his examinations. Filing 86 at 25 (¶ 144) (Deputy Palmer scored 94% on his pepper ball examination where only 80% was required to pass).

Therefore, there is no evidence to suggest that Sarpy County was "deliberately indifferent" in the training of its officers to prevent misuse of pepper balls. *Szabla*, 486 F.3d at 393. To the contrary, it appears that only members of the Sarpy County SWAT Team are permitted to deploy pepper balls, and only highly qualified and trained deputies were permitted to join the Sarpy County SWAT Team. This was especially true of Deputy Palmer. Because Keup could not "persuade a reasonably jury" that Sarpy County is liable for deliberately indifferent failure to train, *Schilf*, 687 F.3d at 948, summary judgment is appropriate on Keup's claims against Sarpy County.

## IV. CONCLUSION

For these reasons, Defendants are entitled to summary judgment on all claims brought by plaintiff Adam Keup. Deputy Palmer is entitled to qualified immunity on Keup's First Amendment retaliation claim because Keup did not engage in what was clearly established as constitutionally protected activity. Deputy Palmer is also entitled to qualified immunity on Keup's Fourth Amendment claims because none of Deputy Palmer's actions were clearly established as constituting a seizure under then-existing law. In addition, Sheriff Davis is not subject to liability in his individual capacity because he was not personally involved in any alleged violations. Finally, Sarpy County is not subject to municipal liability because any alleged violations do not stem from official policy, custom, or a deliberately indifferent failure to train. Because the Court does not rely on the opinion testimony of Roy Bedard, the Court denies Keup's Motion to Exclude that

testimony. In addition, because the Court can consider intervening authority *sua sponte*, Defendants Motions for Leave to Cite supplemental authority are also denied. Accordingly,

IT IS ORDERED:

1. Defendant Sheriff Jeff Davis's Motion for Summary Judgment, Filing 77, is granted;

2. Defendant Deputy Nicholas Palmer's Motion for Summary Judgment, Filing 80, is granted;

3. Defendant Sarpy County's Motion for Summary Judgment, Filing 84, is granted; and

4. Plaintiff's Motion to Exclude Opinion Testimony of Defendants' Retained Expert Roy R. Bedard, Filing 91, is denied as moot; and

5. Defendants' Motion for Leave to Cite Supplemental Authority, Filing 112, is denied as moot; and

6. Defendants' Motion for Leave to Cite Supplemental Authority, Filing 113, is denied as moot.

IT IS FURTHER ORDERED that a separate judgment shall enter accordingly.

Dated this 21st day of December, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge